IN RE J.P.

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-026-CV

IN THE INTEREST OF 

J.P., MINOR CHILD 

------------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

We withdraw the prior memorandum opinion and dissenting opinion of January 31, 2008 and substitute the following in their place to make nonsubstantive, clerical changes only. 

Introduction

Appellant Laura N. appeals the trial court’s order terminating the parental rights to her child, J.P.  In two issues, appellant argues that the evidence is legally and factually insufficient to support the trial court’s endangerment  and best interest findings.  We reverse and remand. 

Background Facts

On July 7, 2005, appellant gave birth to her son, J.P.  While in the hospital, appellant exhibited what the hospital staff thought was alarming behavior, such as leaving J.P. alone in the room, pacing the halls, and failing to remember parenting instructions.  The hospital contacted Texas Department of Family and Protective Services (TDFPS), and TDFPS investigator Christina Burt visited appellant at the hospital on July 10, 2005.  Burt testified at trial that appellant was coherent when she spoke with her at the hospital.  Appellant told Burt her mental history, which included schizoaffective, bipolar, and obsessive compulsive disorders.  Appellant testified that her memory following J.P.’s birth is “fuzzy” because of an adverse reaction to her epidural and postpartum depression. 

After meeting with appellant, Burt visited appellant’s home on Carolina Street while she and J.P were still in the hospital.  During the trial, Burt testified that when she had arrived at appellant’s house,

[t]he odor in the home was nauseating.  There was a very strong odor of what I believe was cat urine and cat feces and it was nauseating.  There were piles of clothing and clutter throughout the house.  There was what I believed was animal feces smeared on the floors, and there didn’t appear to be any area for the baby to be.  There wasn’t a room set up, there wasn’t a bed set up. . . .I did not see a car seat. . . . I did not see a playpen. . . . I did not see a crib. . . . I saw parts of a bassinet. 

Burt determined that the home was not a suitable environment for a child.  Burt also testified that she visited appellant’s mother’s trailer on Blairhouse Road, and although the home was crowded because appellant’s sister and her child were also living there, it was adequate.  Burt discussed her concerns with appellant and appellant agreed on a safety plan, which included appellant’s staying with her mother and cooperating with TDFPS.  

Appellant and J.P. stayed with appellant’s mother as requested by TDFPS until July 20, 2005, when appellant returned to her apartment due to tensions with her sister.  The next day, on July 21, 2005, Susan Hawes, appellant’s sister, contacted Burt and told her that appellant had left their mother’s house.  
Burt, however, did not know until trial that appellant had stayed at her apartment on Carolina Street in violation of the safety plan. 

Also on July 21, 2005, North Texas Community Care Center (NTCCC) also contacted Burt because appellant had brought J.P. in for a check-up and was acting “bizarre.”  Burt went to NTCCC and found appellant agitated.  At appellant’s request, Burt took her and J.P. to the Crisis Respite Center (CRC), an emergency care center for mental health issues.  Burt testified that appellant was more familiar with CRC, and appellant told Burt that J.P. could not accompany her to CRC if they kept her.  Burt took J.P. at that time because appellant could not take a child with her to CRC.
(footnote: 2)  Appellant testified that she was at CRC for fifteen minutes.  CRC checked her medications and told appellant that she had postpartum depression.  J.P. has remained in foster care since July 21, 2005 and is now about two and a half years old.

Later that day, Burt returned to appellant’s apartment.  Burt testified at the hearing that the apartment was in a better condition than it had been when she had seen it two weeks before, but she found that there was still a cat odor, clutter, and a lack of appropriate child equipment.  Burt testified that appellant’s mental state on July 21, 2005, and the condition of the home, caused her to pursue removal of the child.  On July 22, 2005, the trial court granted the TDFPS emergency custody of J.P. 

Following removal, TDFPS gave appellant a service plan, which required appellant to participate in family group conferences, complete parenting classes, attend counseling, and demonstrate age-appropriate parenting skills.  The caseworker for TDFPS, Linda Johnson, testified that, at the time of trial, appellant had not been able to demonstrate age-appropriate parenting skills during visitations and stated that on one occasion, appellant had slapped  J.P.’s hand.  Johnson tried to give appellant child development information and asked her not to hit the baby’s hand, but appellant became defensive, angry, and hostile.  In addition, Johnson testified that appellant could not appropriately feed J.P.  Carissa Matlock, a case supervisor for Child Advocates, the local CASA branch, also testified regarding appellant’s parenting skills and ability to properly feed J.P.  Matlock stated that during one visitation, appellant was changing J.P.’s diaper when he began urinating.  Appellant just laughed instead of covering it up or trying to clean up the mess.  Matlock testified that many times appellant seemed anxious, and she paced while carrying J.P.  Matlock feared appellant would drop him.  Matlock also testified about an incident that occurred when appellant was trying to feed J.P.  Appellant became agitated and threw the jar of baby food in the trash can, but Matlock later saw appellant feeding J.P. again and believed appellant retrieved the jar out of the trash can. Matlock testified that appellant did not demonstrate adequate parenting skills.

Another aspect of appellant’s service plan required her to choose friends and associates carefully and provide information to her caseworker regarding people staying in her home.  Johnson testified that appellant had not complied with this part of her service plan.  
Appellant testified that she had not made wise choices in boyfriends, friends, and associates, but she did not explain why she failed to provide information about her associates to TDFPS.  Appellant engaged in several brief relationships with men she had met over the Internet, many of whom had mental health problems, proposed to her, or had criminal offenses. 

Appellant also underwent a psychological evaluation and counseling. Appellant saw Dr. Butler, a counselor and therapist, from September to December 2005, until the sessions ended by mutual agreement because Dr. Butler did not think he could help appellant anymore.  Appellant then saw therapist Dr. Vandehey during February and March 2006, but when his Medicare number expired, he could no longer see appellant.  Around May 21, 2006, during the period between seeing Dr. Vandehey and finding a new doctor, appellant called the CRC to get counseling.  Appellant testified that she was trying to get help and made a flippant remark stating, “What do I have to do to get help around here, slit my wrists?”  Appellant’s comment resulted in her being committed for twenty-nine days in a state hospital.  Appellant later told Johnson that she had a nervous breakdown. 

Appellant testified that she had been hospitalized seven to eight times since learning of her mental difficulties at age twenty.  She also testified that she has threatened suicide “many times.”  Appellant also stated that she had been in and out of the CRC “not more than two dozen” times between 1997 and 2004.  Johnson, however, admitted that appellant had sought help from mental health professionals and complied with her counseling requirements.  Furthermore, appellant complied with random drug screens, and Johnson testified that she did not believe appellant was doing drugs.

Johnson also testified that another portion of the service plan required appellant to allow Johnson to come in and inspect her home.  The service plan instructed appellant to maintain a safe, clean, and sanitary environment.  On July 28, 2005, Johnson visited appellant’s apartment on Carolina Street for the first time and testified that it smelled of cat urine and that there was clutter everywhere.  The condition of the home did not meet the appropriate standard under the service plan.  Johnson visited the home again on September 16 and October 4, 2005, and found it in a similar condition.  At some point, appellant moved back in with her mother on Blairhouse Road.  Johnson visited appellant at the Blairhouse Road residence and stated that between August and December 2006, appellant’s mother’s home was a clean, safe, and sanitary environment.  Appellant had installed childproof mechanisms in her mother’s home and made repairs to the house.  Appellant also had a crib, clothes, and toys.  
Johnson, however, testified that it was too soon to know if appellant could maintain the clean environment.  
Johnson also testified that appellant had poor hygiene.  For example, her feet were sometimes black, and she had an odor. 

TDFPS also required appellant to demonstrate her ability to save and maintain a budget as part of her service plan.  Johnson testified about her concern regarding appellant’s financial condition.  For example, appellant had trouble paying her rent and being overdrawn on her bank account.  At the time of the hearing, however, appellant worked at Wal-Mart as a cashier, on disability, and received Social Security.  Appellant had also purchased a car two weeks before the termination hearing.  Appellant stated that she planned to continue to work, wanted to raise J.P. in church, and would live with her mother.  

Johnson testified that appellant had regularly visited and maintained contact with J.P. since he was removed in July 2005.  She stated that J.P. had a bond with appellant, but that appellant still lacked appropriate parenting skills.  Johnson testified that TDFPS was concerned that although appellant had made some improvements, the improvements were not enough to establish a pattern that would insure J.P.’s well-being.  However, the judge’s October 26, 2006, status hearing order stated that appellant had “demonstrated adequate and appropriate compliance with the service plan.” 

 
 By November 7, 2006, TDFPS sought to terminate appellant’s parental rights.  A bench trial was held on January 9 through January 11, 2007, when J.P. was one and a half years old.  J.P.’s attorney ad litem, in his closing statement, remarked that he could not give a recommendation in the case but asked the court to take note of Matlock’s recommendation as the guardian ad litem.  Matlock recommended that appellant’s parental rights be terminated.  After the termination hearing, the trial court terminated appellant’s parental rights to one and a half year old J.P. and determined that appellant knowingly placed or knowingly allowed J.P. to remain in conditions which endangered his physical and emotional well-being, engaged in conduct or 
knowingly placed J.P. with persons who engaged in conduct which endangered J.P.’s physical or emotional well-being, and termination was in J.P.’s best interest.
(footnote: 3)  The trial court also appointed TDFPS as J.P.’s permanent managing conservator.  Appellant filed this appeal challenging the legal and factual sufficiency of the evidence concerning the trial court’s endangerment and best interest findings. 

Standard of Review

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003). 
In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.
  T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon Supp. 2007); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  
Holick
, 685 S.W.2d at 20-21;
 In re E.M.N.
, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001 (Vernon Supp. 2007); 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence instead of merely a preponderance of the evidence.  T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263-64 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. 
 
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
In re C.S.
, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied).  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”  
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

1. Legal sufficiency

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review.  
J.F.C.
, 96 S.W.3d at 265-66; 
In re S.B
., 207 S.W.3d 877, 884 (Tex. App.—Fort Worth 2006, no pet.).  The traditional no-evidence standard does not adequately protect the parent’s constitutional rights.  
J.F.C.
, 96 S.W.3d at 265; 
S.B
., 207 S.W.3d at 884.  
Therefore, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven.  
In re J.P.B.
, 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light most favorable to the finding and judgment.  
Id.
  This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so.  
Id.
  We must also disregard all evidence that a reasonable fact-finder could have disbelieved.  
Id.
  We must consider, however, undisputed evidence even if it is contrary to the finding.  
Id.
  That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not.  
Id.

We must therefore consider all of the evidence, not just that which favors the verdict.
  Id. 
 But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder’s province.  
Id. 
at 573, 574.  And even when credibility issues appear in the appellate record, we must defer to the fact-finder’s
 
determinations as long as they are not unreasonable.  
Id. 
at 573.

If we determine that no reasonable fact-finder could form a firm belief or conviction that the grounds for termination were proven, then the evidence is legally insufficient, and we must generally render judgment for the parent
.  
J.F.C.
, 96 S.W.3d at 266; 
see
 
Tex. R. App. P. 
43.3.

2. Factual sufficiency

The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review.  
In re C.H., 
89 S.W.3d 17, 25 (Tex. 2002); 
S.B
., 207 S.W.3d at 885.  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on mere preponderance.”  
C.H., 
89 S.W.3d at 25; 
S.B
., 207 S.W.3d at 885.  
We are instructed to give due deference to the fact-finder’s
 
findings and not supplant the judgment 
with our own.  
In re H.R.M.
, 209 S.W.3d 105, 108 (Tex. 2006)
.  We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated subsections D and E
 
of section 161.001(1) and that the termination of the parent’s parental rights would be in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E)
 
&
 
(2);
 In re C.H.
, 89 S.W.3d at 28.  
If, in light of the entire record, the disputed evidence
 
rises to the level of being clear and convincing so that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  
H.R.M.
, 209 S.W.3d at 108.  If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding.  
J.F.C.
, 96 S.W.3d at 266-67.

Endangerment Findings

We first review the evidence supporting the trial court’s findings that appellant (1) knowingly placed or knowingly allowed J.P. to remain in conditions or surroundings which endangered his physical and emotional well-being and (2) engaged in conduct or 
knowingly placed J.P. with persons who engaged in conduct which endangered J.P.’s physical or emotional well-being.  
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E). 

Under section 161.001(1)(D), the environment of a child must be examined to determine if that is a source of endangerment to the child.  
Tex. Fam. Code Ann.
 § 161.001(1)(D); 
In re D.T., 
34 S.W.3d 625, 632 (Tex App.—Fort Worth 2000, pet. denied).  Under section 161.001(1)(E) of the Texas Family Code, the term “endanger” means to expose to loss or injury, to jeopardize. 
 Boyd
, 727 S.W.2d at 533.  Accordingly, when analyzing the trial court’s findings under subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child’s physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act.  
In re D.M.
, 58 S.W.3d 801, 811-12 (Tex. App.—Fort Worth 2001, no pet.).  Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
Tex. Fam. Code Ann
. § 161.001(1)(E); 
D.T.
, 34 S.W.3d at 634; 
In re K.M.M.
, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).  However, it is not necessary that the parent’s conduct be directed at the child or that the child actually suffer injury. 
 Boyd
, 727 S.W.2d at 533.  The specific danger to the child’s well-being may be inferred from parental misconduct standing alone.  
Id
.

To determine whether termination is necessary, courts may look to parental conduct both before and after the child’s birth.  
D.M.
, 58 S.W.3d at 812.  As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.  
In re S.D.
, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). 

1. Appellant’s mental health
 

In the present case, TDFPS points to appellant’s history of mental  health issues as evidence of endangering conduct.  A parent’s mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child.  
In re J.I.T.P.
, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th 
Dist.] 2003, no pet.);
 In re C.D.
, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ).  Further, threats or attempts to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that is detrimental to a child’s physical or emotional well-being.  
See
 
In re A.M.C.
, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.).

The record demonstrates that appellant had continuously struggled with mental instability, including suicidal thoughts.  Appellant admitted that she has schizoaffective disorder and exhibits symptoms which include schizophrenia  and bipolar disorders.  During appellant’s pregnancy, she was admitted to CRC two times.  On July 21, 2005, when TDFPS removed J.P. from appellant, appellant experienced a mental health crisis after giving birth.  Appellant testified that at that time, she was taking Abilify, Lamictal, and Lexapro.  She requested that TDFPS investigator Burt take her to CRC.  Appellant told Burt that J.P. could not accompany her, and it was at that point that Burt removed J.P.  Thus, appellant voluntarily relinquished possession of her child so that she could seek emergency medical help.  CRC told her that she had postpartum depression.  Although appellant’s mental condition at that time could have endangered J.P., she voluntarily chose to place him in a safer environment; J.P. was never back in appellant’s care after July 21, 2005.

In August 2005, appellant told Johnson that a drug lord named Aaron Brown was after her and her friend Rhonda.  Appellant allowed Rhonda to stay with her for a brief time.  Appellant told Johnson she had to start smoking and disguise her appearance to hide from this drug lord.  However, appellant testified at trial that at the time she made those statements, she was still adjusting to her medication, and she was exhibiting psychotic behavior.  She stated that none of what she said regarding Brown was true and that she had been delusional.  Appellant later told Johnson that she was mistaken that Brown was a drug lord who was after her.  Johnson also testified that appellant told her that Brown was going to be J.P.’s godfather.

On May 29, 2006, appellant was between doctors and trying to obtain her court-ordered counseling when she made what she described as a flippant remark to someone at CRC about slitting her wrists.  CRC took her comment as a suicide threat, and appellant was taken to the state hospital under a court-ordered commitment.  The hospital released appellant twenty-nine days later. 

The evidence showed that although appellant had been hospitalized on numerous occasions after learning of her mental difficulties at age twenty, she had always sought help when her medication was not working or when she was having trouble.  Appellant had not done drugs, nor did she drink alcohol because she feared it would interfere with her medication.  Appellant complied with random drug testing as part of her service plan, and Johnson testified that she did not believe appellant was doing any illegal drugs.  In fact, Johnson stated that appellant had sought help from mental health professionals and complied with all of her counseling requirements.  
Appellant stated that if she had another episode like she did after J.P.’s birth, she would not hesitate to call TDFPS because she would call TDFPS on herself rather than hurt her child.  Additionally, no doctor testified at trial regarding appellant’s mental health problems.  Furthermore, TDFPS did not claim that appellant failed to comply with the counseling portion of her service plan.  Moreover, appellant never threatened to harm J.P.; in fact, she voluntarily relinquished him so that she could seek treatment. 
 

2. Appellant’s living conditions

Regardless, TDFPS also points to appellant’s living conditions as evidence of endangering conduct.  When Burt initially visited appellant’s home on Carolina Street, she found the smell nauseating because of the strong odor of cat urine.  Additionally, she found cat feces smeared on the floor.  Burt also observed piles of clothing and other clutter throughout the house but did not see any baby equipment.  Appellant testified at the hearing that before she gave birth, she did not have much strength, and D.P., J.P.’s father who was living with appellant at that time, did not help her maintain or clean their home. Appellant stated that he did not clean the litter box, that he continually brought his friends over, and that they trashed the place.  Appellant, however, slowly got her house in order.  Appellant stated that when Burt returned to appellant’s apartment on Carolina Street on July 20, 2005, the house was “spotless”; the dishes were washed, the floor swept and mopped, and the cat was out of the house.  Appellant said she even got rid of her cat for a while.  However, Burt testified that the home was better but not spotless.  Burt also stated that the clutter in the front room had been removed and that she did not notice any animal feces on the floor.  Despite the improvements, Burt did not believe the conditions of the home were appropriate for the child.  When she considered the conditions of the home along with appellant’s mental condition and her behavior, Burt thought that appellant was endangering J.P. 

Between July and October 2005, Johnson also visited appellant’s home on Carolina Street three times.  She testified that each time she visited, the home smelled of cat urine and found that there was clutter everywhere. Johnson stated at one visit, she found mud on the stairs and the upstairs fire escape locked.

However, at the time of the hearing, appellant had moved back into her mother’s house on Blairhouse Road.
(footnote: 4)  Appellant’s sister was no longer living at her mother’s home.  Appellant testified that she wanted to look for an apartment after her finances were better.  She also said she wanted her mother to move with her, but her mother had been in that house for a long time.  Her mother’s home had three bedrooms.  Appellant had repaired a broken window in the back room, installed childproof mechanisms, and obtained a crib, clothes, and toys for J.P.  Between August and December 2006, Johnson found appellant’s home on Blairhouse Road to be clean, safe, and sanitary. 

Although TDFPS argued that it was too soon to determine whether appellant could maintain a clean living environment, appellant had moved out of her home on Carolina Street and into her mother’s home on Blairhouse Road, which TDFPS determined was clean, safe, and sanitary.  In fact, Johnson admitted that the home on Blairhouse Road was adequate for a child’s needs and that the home was consistently clean and neat when TDFPS visited.

3. Appellant’s service plan

TDFPS also contends that appellant did not work her service plan because she had not demonstrated age-appropriate parenting skills, maintained a budget, or chosen friends and associates carefully.  The status hearing order, however, from October 26, 2006, stated that appellant had “demonstrated adequate and appropriate compliance with the service plan.”  The record indicates that appellant had difficulty demonstrating age-appropriate parenting skills although appellant did complete her parenting classes, which were required by her service plan.  For example, on one occasion, when appellant slapped J.P.’s hand, she became defensive when Johnson advised her not to hit J.P.’s hand and when Johnson attempted to give appellant child development information.  Johnson, however, testified that she did not witness the slapping incident firsthand and confronted appellant about the incident six days later.  
Matlock, a case supervisor for the local CASA branch
, stated that appellant was anxious and paced while holding the baby, and Matlock feared appellant would drop J.P.  
Matlock also testified that during one visitation, appellant was changing J.P.’s diaper and he began urinating, and appellant just laughed instead of covering it up or trying to clean up the mess.  
Appellant admitted that she was told not to put her finger in J.P.’s mouth after she changed his diaper.  The record also indicates that appellant had trouble appropriately feeding J.P.  Caseworker Johnson stated that appellant would put a bottle in J.P.’s mouth and then pull it out, causing him to be fussy and cranky.  On another occasion, appellant attempted to feed J.P., but after becoming frustrated, she threw the jar of baby food in the trash can.  Later, appellant again tried to feed J.P., and Matlock believed that appellant had retrieved the jar out of the trash can.

Appellant testified that she completed her parenting classes and learned that the best way to discipline children is through taking away privileges. Appellant also read the books 
What to Expect the First Year 
and 
Parenting for Dummies
, which were recommended by her caseworker.  In May 2006, appellant admitted that she brought a pocket knife to her visitation with J.P. but that she gave the knife to the lady behind the counter.

Appellant regularly visited J.P. and maintained significant contact with her son.  Appellant participated in her weekly visits with J.P. during the seventeen months he had been in foster care, which was approximately seventy visits. Appellant stated she missed only one or two visits with J.P. that were not related to illness.  She also stated she thought she was late or left early once or twice although she did admit that she sometimes had problems with transportation.  For example, on August 17, September 14, and September 25 of 2006, appellant was seven to ten minutes late because of transportation problems.  On September 21, appellant called and canceled her visitation after her visitation hours had started.  Appellant testified that during some visits she would sleep but would wake up if she heard J.P.’s voice.

The evidence shows that appellant made most of her visits with J.P. and that she and the child had significant contact.  Additionally, Johnson stated that appellant had participated in her visitations as best she could.  Appellant’s service plan also required her to demonstrate her ability to save and maintain a budget.  Although appellant, at times, had difficulty paying her rent, at the time of the hearing, she had secured a job as a cashier at Wal-Mart.  Before working at Wal-Mart, appellant had a hard time obtaining a job because of her lack of work history due to her mental health issues.  Appellant tried having a booth at Corner Emporium; she also did some groundskeeping at Hawk Ridge Golf Course but was laid off because she got heatstroke.  Appellant, however, never gave TDFPS any paperwork indicating that she held these jobs for more than one month.  In 2001, appellant got a job as a data entry specialist, which she kept for a few months until her computer broke.  Appellant was also taking correspondence classes to learn to become a medical coder.  Furthermore, appellant was on disability and received Social Security.  Appellant had also purchased a car two weeks before the termination hearing.  Thus, the evidence shows that at the time of the hearing appellant had found a job, purchased a car, and was in the process of becoming financially secure. 

Appellant’s service plan also required her to choose friends and associates carefully and to provide information to her caseworker regarding people staying in her home.  Johnson testified that appellant had not complied with this part of the service plan.

The evidence showed that appellant had a history of unstable relationships.  She married Timothy Collins in 1998 and divorced him after two months of marriage because he was psychologically abusive and controlling.  Appellant married Robbie Wilson in 1999 and divorced him a year later because he was physically abusive. 

Appellant initially met D.P., J.P.’s father, in the summer of 2004. Appellant saw D.P. again in October at a friend’s house, and they began dating around Thanksgiving.  D.P. told appellant that he had children who lived with his parents and that he could contact them through the Internet.
(footnote: 5)  Appellant did not know D.P. was married until after she became pregnant.  D.P. lived with appellant at the Housing Authority.
(footnote: 6)  Another man named Josh Cheadle also lived with them.  Cheadle would help out with groceries.  Appellant testified that in October 2005, after D.P. had moved out, he came over to her apartment and raped her. 

At the beginning of 2006, appellant met Garry Jones by a Walgreens near Sacred Heart Catholic Church.  They dated for three weeks, and appellant told Johnson that she and Jones were going to get married in March.  Appellant gave Johnson Jones’s date of birth and Social Security number.  Appellant also told Johnson she might be pregnant, but she was not.  Appellant told Johnson that Jones was going to move in with her and her mother after they were married.  Appellant informed Johnson that Jones had been diagnosed with dementia as a child, had been in juvenile detention, was on Seroquel and Zoloft, had been in the state hospital three times, and had petitmal seizures but did not take his medication.  Appellant later told Johnson that Jones’s mental health problems were too severe, so she broke up with him and that they were just friends.  Appellant testified that she did not know Jones had been convicted of several crimes, including felony theft and misdemeanor criminal trespass, or that he had been in prison.

In early 2006, appellant also went out on a date with her neighbor Victor Rice whom she had known since 2004.  Rice repeatedly asked appellant to marry him, but she had always refused.  After their date, she agreed to marry him but then backed out the next day.  Appellant told Johnson in February 2006 that she cut off her friendship with Rice and that she had to call the police on him. 

Appellant met Corey Mack in March 2006 on a city bus, and they began dating in April.  Mack helped appellant set up her booth at the Corner Emporium.  Mack also rode with her to visitations with J.P. but did not go in with her to the visits.  Appellant broke up with Mack because he was bipolar and refused to take his medicine.  Appellant also met Maurice Grange on a city bus in 2005, and they dated.  Appellant stated Grange also had mental health issues, so she broke up with him; he disappeared.  Grange reappeared after J.P. was born and wanted to date appellant again.  Appellant saw him a few times, but when he began acting strangely, she threatened to call the police and he disappeared again.  Caseworker Johnson testified that appellant told her that she was going to marry Grange.  Appellant also has a friend named Chris Wright, but they never dated.  Appellant and Wright have been friends since 1998.  Wright had the same mental health diagnosis as appellant, but he was also diabetic.

In November 2006, appellant met a man named Leon from Tennessee on the Internet, and they talked for a couple of weeks on the phone.  Appellant stated that Leon had asked her to marry him: she thought that was weird, so she quit talking to him.  Appellant had chatted with a couple of other men online.

Appellant most recently dated Jimmy Howells.  Appellant testified that they did not have a relationship but that they just saw each other for a couple of weeks although she had known him for five years.

Appellant provided TDFPS with several possible placements for J.P. Appellant suggested Jesse Barns, the son of appellant’s friend Joy Amyx, as a possible placement.  Barns, however, had an extensive criminal history including injury to a child.  Appellant stated that she did not know about his criminal history when she suggested Barns as a placement but did not want him as a placement after she learned about his background.  Appellant also wanted Myra Brown to babysit, but Brown had convictions for theft and criminal trespass.  In 2004, appellant met Sandra Benton.  During the months of November and December 2005, appellant learned Benton was homeless; appellant allowed her to be placed on appellant’s lease and stay with her.  Benton also had a criminal history that included a felony prosecution for tampering with a government record and theft.  Appellant stated that she had let people live with her because they were homeless during the holidays but that she would not do that again.  Appellant testified that she is not seeking a relationship with anyone and that she does not keep friends with a criminal record and refuses to bring them around her son. 

The record shows that appellant had numerous unstable relationships and friendships with various people, some of whom had criminal records.  D.P.  lived with appellant at the time J.P. was born, but the evidence is not clear regarding when he moved out.  Thus, there is no evidence that any of these relationships influenced or affected J.P. or that appellant would continue this type of behavior if J.P. were living with her.

Analysis

We first address whether the evidence is legally sufficient to support the finding that appellant (1) knowingly placed or knowingly allowed J.P. to remain in conditions or surroundings that endangered his physical or emotional well-being and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered his physical or emotional well-being.  
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E). 

Here, the record contains some evidence concerning appellant’s history of mental instability.  In addition, the record shows that there is some evidence that appellant failed to maintain a clean living environment suitable for J.P.  because of the nauseating cat odor and continual clutter that filled her apartment.  Furthermore, there is some evidence that appellant did not demonstrate appropriate parenting skills, maintain a financial budget, or choose her friends and associates with caution.  Viewing all the evidence in the light most favorable to the judgment, we hold that the evidence is legally sufficient to support termination under either subsection (D) or (E), and we overrule the part of appellant’s first issue complaining about the legal sufficiency of the evidence to support the termination of her parental rights to J.P. 

We next address whether the evidence is factually sufficient to support the finding that appellant (1) knowingly placed or knowingly allowed J.P. to remain in conditions or surroundings that endangered his physical or emotional well-being and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered his physical or emotional well-being.  
Id.
 

Viewing the evidence in a neutral light, we hold that while the evidence suggests that appellant’s chronic mental health problems may have potentially created a risk to J.P., the evidence regarding her history of mental instability did not rise to the level of endangerment when considered in context with the other evidence in the record.  Although the evidence showed that appellant had mental health issues, the evidence also demonstrated that she was aware of her condition and had sought treatment when she needed assistance, particularly when she considered J.P.’s needs after his birth.  Additionally, although appellant had been to CRC twice during her pregnancy, she had not been to CRC since J.P was removed in July 2005.  In May 2006, appellant was admitted to the state hospital after making a remark about cutting her wrists in an attempt to obtain her court-ordered counseling.  But there is no evidence contradicting appellant’s testimony that the remark was flippant nor is there any evidence that she was, in fact, suicidal at that time or that she had threatened J.P. in any way.  Moreover, TDFPS did not call a doctor to testify concerning appellant’s mental instability.  Also, there is no evidence that appellant’s mental condition harmed J.P.

In addition, although the evidence showed that appellant’s living conditions on Carolina Street were unsuitable for J.P., at the time of the hearing, appellant lived with her mother on Blairhouse Road, and TDFPS admitted that the home was clean, safe, and sanitary.

Furthermore, despite evidence that appellant’s parenting skills were inadequate, appellant had completed parenting classes, maintained significant contact with J.P. by attending weekly visitations, and secured a job so that she could financially provide for her child.  Moreover, while appellant had had many unstable relationships in the past, there is no evidence that J.P. was present when these persons were with appellant, nor is there any evidence of whether these relationships affected J.P. or appellant’s relationship with J.P.  Although there may have been a potential endangering situation regarding appellant’s tendency to invite questionable people into her home, there was no testimony at trial indicating such a situation.  The record failed to show any evidence of harm or injury to J.P.; in contrast, the evidence indicated J.P. was a happy, healthy baby.

Considering the evidence in a neutral light, we hold that the evidence is factually insufficient to support termination under subsection (D) or (E).  We sustain the part of appellant’s first issue challenging the factual sufficiency of the evidence to support the termination of her parental rights to J.P.

Because we have concluded that the evidence is factually insufficient to support termination under family code section 161.001(1)(D) or (E), we do not address whether termination was in J.P.’s best interest, appellant’s second issue.  
See 
Tex. R. App. P.
 47.1.

Furthermore, we note that section 161.003 of the family code provides an alternate method to terminate parental rights if a parent has a mental or emotional illness.  
Tex. Fam. Code Ann.
 § 161.003. Section 161.003 states:

(a) The court may order termination of the parent-child relationship . . . if the court finds that:

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child’s needs until the 18th birthday of the child;

(3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on termination held in accordance with Subsection (c);

(4) the department has made reasonable efforts to return the child to the parent; and

(5) the termination is in the best interest of the child.

(b) Immediately after the filing of a suit under this section, the court shall appoint an attorney ad litem to represent the interests of the parent against whom the suit is brought.

(c) A hearing on the termination may not be held earlier than 180 days after the date on which the suit is filed.

(d) An attorney appointed under Subsection (b) shall represent the parent for the duration of the suit unless the parent, with the permission of the court, retains another attorney.

Id.

Thus, to terminate under this section, TDFPS must prove additional elements not required under section 161.001(1)(D) and (E).  
Id. §§ 
161.001(D), (E), 161.003. 
 
For example, TDFPS must prove by clear and convincing evidence that the mental illness will render the parent unable to provide for the child’s needs until the child is eighteen years old, and TDFPS must make reasonable efforts to return the child to the parent.  
Id. 
§ 161.003(a)(2), (4).  Here, there is no evidence that appellant’s mental health problems would render her unable to care for J.P.  Additionally, TDFPS did not make reasonable efforts to reunite appellant and J.P.  In this case, TDFPS must have recognized appellant’s stability because it did not proceed to terminate her parental rights under section 161.003.  TDFPS admitted that appellant was not faking her mental illness, yet it did not attempt to terminate her parental rights under the more stringent mental illness section of the family code.  Furthermore, no doctor or mental health professional testified regarding appellant’s mental health.  If, as TDFPS claims, appellant’s mental health issues are detrimental to J.P.’s physical and emotional well-being, TDFPS could have sought termination under section 161.003.  While TDFPS was not required to file this case under section 161.003, when a parent suffers from a mental illness, section 161.003 may be more appropriate.  
See In re B.L.M & J.L.M., Jr., 
114 S.W.3d 641, 648 (Tex. App.—Fort Worth 2003, no pet.).

Although the dissent discusses the same facts that we have reviewed regarding the sufficiency of the evidence on endangerment in the context of its best interest discussion, the dissent never explains why it believes that the evidence is factually sufficient to prove endangerment.  After reviewing all of the evidence under the appropriate standard of review, we believe that our conclusion is correct: that the evidence is factually insufficient to prove the endangerment grounds.  Thus, we do not reach the appellant’s second issue, the best interest issue because, based on our holding on the endangerment grounds, we must reverse and remand for a new trial regardless.

Conclusion

Having determined that the evidence is factually insufficient to support the judge’s findings under family code section 161.001(1)(D) and (E), we
 
reverse the trial court’s judgment and remand for a new trial.

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, WALKER, and MCCOY, JJ.

MCCOY, J. filed a dissenting opinion.

DELIVERED: February 4, 2008

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-026-CV

IN THE INTEREST OF J.P., MINOR CHILD

------------

FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

------------

DISSENTING MEMORANDUM OPINION

------------

I respectfully dissent.  Based on the appropriate standard of review as articulated in the majority’s opinion and considering the evidence in a neutral light, I would overrule Appellant’s issues challenging the legal and factual sufficiency of the evidence to support the termination of her parental rights, as that evidence is set forth in the majority’s opinion, and would therefore reach the question of whether termination was in the best interest of J.P.  

All parties agree that the Texas Supreme Court has articulated the factors to consider regarding the “best interest” in a termination case in 
Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  Those nonexclusive factors  include the following: 

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the 

future; 

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

Id
. at 372.

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
In re C.H
., 89 S.W.3d 17, 27 (Tex. 2002).  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  
Id.
  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  
Id.

I.  The 
Holley
 Factors

Applying the evidence to the 
Holley 
factors yields the following:  

(1) The Desires of the Child

TDFPS asserts that both Appellant and TDFPS agreed that the child was unable to express his desires due to his age. 

Appellant responds that there is no testimony as to the desires of the child in this case, and given J.P.’s tender years, the testimony would be scarcely credible even had it been given.  Appellant does not believe that under the record there are any facts she can point to that would show that J.P. favors either her or TDFPS’s position.

(2) The Emotional and Physical Needs of the Child Now and in the Future

TDFPS asserts that Appellant’s parenting record includes (1) Appellant’s slapping J.P.’s hands, (2) Appellant’s having problems feeding J.P., (3) Appellant’s having problems recognizing J.P.’s proper emotional responses, (4) Appellant’s retrieving a jar from a trash can and feeding J.P. from it, (5) Appellant’s arguing with TDFPS personnel after being requested not to stick her finger in J.P.’s mouth after changing his diaper, (6) Appellant’s acting anxious and pacing, and being more interested in talking to other parents than visiting with J.P., and (7) Appellant’s falling asleep during visits with J.P.  Caseworker Johnson and CASA supervisor Matlock testified that Appellant had not learned proper parenting techniques for J.P. Johnson stated that she did not believe Appellant could raise the child because of her mental limitations and emotional and psychological limitations.  Johnson testified that she had concerns over Appellant’s past poor choices, continued psychological difficulty, her ability to learn the right procedures and transition among J.P.’s stages, and basically age-appropriate parenting.

Appellant asserts that she testified that she may be better equipped to handle any mental health issues J.P. might have because of her own experiences.  Appellant further testified that she had adequate parenting skills and could learn more and that she would be able to address J.P.’s physical and psychological needs now and in the future.

However, Johnson and Matlock testified to specific examples of Appellant’s inability to care for J.P.  Both stated that despite attending parenting classes, Appellant was unable to translate anything she had learned into actual use.  Regarding Appellant’s contention that she could assist J.P. should he require mental health treatment, TDFPS points out that she herself did not follow through with mental health issues and had not achieved stability in her own mental health needs.

Appellant responds that J.P. needs what all children need—love and a roof over their heads—and that TDFPS stated that as of the date of trial, Appellant’s mother’s house was adequate to meet J.P.’s needs. 

(3) The Emotional and Physical Danger to the Child Now and in the Future

TDFPS asserts that Appellant testified to numerous mental health crises and mental hospitalizations during the pendency of the case and stated that she had threatened suicide “many” times in the past.  Further, Appellant permitted various individuals with criminal records to reside at the home, even after Appellant informed Johnson that she had found drug paraphernalia in her home from J.P.’s father while she was pregnant.  Caseworker Burt stated that upon her second visit to the residence there were several persons there, including the child’s father, who was not a viable placement because of his extensive CPS history.  Appellant refused to believe Burt when advised of the child’s father’s CPS history.  Appellant admitted to suggesting Jesse Barns, an individual with a criminal history, as a placement for J.P.  Appellant testified that she has permitted several dangerous individuals to live with her after J.P.’s removal.  Appellant permitted Rhonda, whose last name she did not know, to move in with her in August 2005.  At that time, Appellant began having a series of delusions, believing that Aaron Brown, yet another individual with a criminal history, was a danger to her because Rhonda was living with her.  She admitted to permitting Sandra Benton, an individual with a criminal history, to live with her in late 2005 and attempting to help Benton get on Appellant’s lease.  Appellant displayed no stability for the child as she received several eviction notices due to nonpayment of rent during the case.

Appellant responds that at the present time, with J.P. being in TDFPS-approved foster care, there is no imminent danger to the child and that there is no evidence that J.P. would be in any danger with her either.  Johnson said that Appellant’s accommodations at the time of the trial were acceptable to TDFPS and that TDFPS had no objection to Appellant’s plans to stay in the house, so there was no present or future “physical danger” to the child.  As to the present or future “emotional danger” to J.P., Appellant agreed that under the record that is a closer call, but at the time of trial, no one from TDFPS was questioning Appellant’s competence or her ability to hold a job. 

(4) The Parenting Ability of the Individual Seeking Custody

TDFPS asserts that, as Appellant points out, the nurses at the hospital had concerns regarding Appellant’s ability to parent.  As mentioned above, Johnson and Matlock testified to specific examples of Appellant’s inappropriate parenting.  Johnson testified that she had seen nothing in the eighteen months of the case to indicate that Appellant’s parenting abilities had improved.  Both Johnson and Matlock stated that termination would be in the child’s best interest.

Appellant responds that the record is barer than one would hope it would be.  Essentially, the child was taken from his mother when he was two weeks of age and had been in the care of TDFPS ever since. 

(5) The Programs Available to Assist the Individual Seeking Custody

TDFPS asserts that Johnson testified that Appellant did not demonstrate the parenting skills that were taught in the parenting classes offered to her. Matlock stated that Appellant did not demonstrate appropriate parenting in the visitations and that Appellant had not learned from her parenting classes. 

Appellant alleges that by availing herself of government benefits, this factor weighs in her favor because a firm belief or conviction could not be formed that there were not programs available to her, nor that she would not use such programs.  The only programs mentioned in relation to the child were WIC and Medicaid.  Appellant responds that the record was extensive on this point, and Appellant was able to catalogue the benefits she already received.  Appellant has previously availed herself of government benefits and will continue to do so in the future if her needs require it and if the government allows it.  

However, Appellant presented no evidence of her efforts to begin either program, nor did she present evidence of her attempts to find any others. 

(6) The Plans for the Child by the Individual or by the Agency Seeking Custody

TDFPS asserts that Appellant wants to remain J.P.’s mother.  Appellant also stated that she wanted to teach J.P. the value of work and faith.

However, Appellant gave no concrete details of specific plans or actions she intended to undertake in order to secure J.P.’s return and to meet his needs.  TDFPS urges that the trial court was entitled to infer that Appellant’s future actions would be adverse to J.P. after her recommendation of Jesse Barns, an individual with a conviction for injury to a child, as a placement for the child.

Appellant responds that there is no controversy here and that she wants to be the mother of her child.  TDFPS wants the child to be adopted but not by the foster family.  Under either plan, there will be a parent or parents for the child; but under Appellant’s plan the parent actually gets to be a parent, whereas under TDFPS’s plan, a stranger—literally a stranger to the child—will get to be a parent.

(7) The Stability of the Home or Proposed Placement

TDFPS asserts that Johnson testified that Appellant had not demonstrated any stability and that she had concerns for Appellant’s ability to provide the child with a safe environment.  In addition, Appellant testified to the multiple unstable relationships that she had been involved in.  Appellant chose to become engaged to Corey Mack, an individual with a history of family violence.  Appellant also testified regarding the numerous individuals with criminal records whom she permitted to live in her home, even during the pendency of the case.  Appellant displayed no job stability or residential stability as she received several eviction notices during the pendency of the case.  Matlock testified that she did not believe Appellant had learned coping skills from her counseling.  Appellant failed to show that her present residential stability would continue in the future.  Appellant advised Johnson that she was considering moving out of her mother’s house as recently as December 2006.  During the case, Appellant was unable to pay her rent and severely overdrew her checking account, causing concern about her ability to handle her finances.  Despite this financial mismanagement, Appellant discussed internet service at trial.  TDFPS contends that the need for Appellant’s stability is not limited to a physical residence; it encompasses the entire environment the child will be exposed to, physically and emotionally.  Appellant did not show that she was able to make rational and stable decisions for the child’s case.  In addition, an adoptive placement is not a prerequisite to finding that a parent has committed one of the grounds for termination and that termination is in the child’s best interest. 
 Kilpatrick–Lusk v. Tex. Dep’t of Family & Protective Servs.
, No. 03-05-00548-CV, 2006 WL 3329431, at *2 (Tex. App.—Austin Nov. 16, 2006, no pet.) (mem. op.).

Appellant argues that her current home is stable.  She further contends that TDFPS cannot prove its placement is more stable because there has not been an adoptive home found yet. 

Appellant admits to having many friends and admits that not all of those friends were or are everything one would hope them to be.  But as far as the home goes, Appellant’s current home—her mother’s trailer—was and has been acceptable to TDFPS.  Appellant said she has a stable home, and so, presumably, the next one will also be. 

(8) Acts or Omissions Which May Indicate the Parent-Child Relationship Is Not Proper

TDFPS asserts that Appellant’s contention—that her acts or omissions were “trivial in nature” because no one has suggested the child was injured in her home—downplays her poor parenting skills, stating that two weeks is not much time to learn how to be a parent.  Finally, Appellant argues that she sought help from TDFPS and that she sought to eradicate her weaknesses rather than amplify them.  Appellant’s refusal of mental health care does not indicate an attempt to “eradicate” the issue.  Appellant refused to believe Burt when advised about the child’s father’s CPS history, even though she later admitted to his bringing drug paraphernalia into her residence.

Appellant responds that she had acquaintances with inadequacies, but that is neither a crime nor particularly unusual.  Although she was not frugal with her money, people in bankruptcy get to keep their babies.  She did not exhibit solid parenting skills, but “two” weeks is not much time to learn how to be a parent.  

TDFPS responds that Appellant did not have just two weeks to learn how to parent this child; she had the entire pendency of the case, which was over a year.  After a year of visits and a year of classes and assistance, Appellant still was unable to parent J.P.  

Appellant further urges that the only physical “act or omission” that the State had against Appellant as a justification for taking J.P. was that she had two cats, a dirty cat box, a mildly cluttered apartment, and that she lacked consumer perfection in her acquisition of infant care preferences.  As for a psychological “act or omission,” she had a temporary psychic dislocation, an episode for which she recognized and sought help from TDFPS.  Appellant’s “acts and omissions” were trivial in nature, and the best indication of their fundamental triviality is that no one has said or suggested that J.P. in any way suffered from being in a smelly home with a semi-lucid mom eighteen months ago.  In fact, no one, she argues, suggested that the child in any way suffered from his association with an admittedly flawed individual. 

(9) Excuses for The Parent’s Acts or Omissions

Appellant asserts that she has a mental illness that “she did not ask for.” She alleges that she has as meritorious an excuse as possible (mental illness) but argues that there must be a bad act before an excuse is necessary.  She goes on to state that she will not ask forgiveness when she did nothing wrong. 

TDFPS responds that Appellant’s mental illness may be an excuse, but her refusal of treatment was not.  Even at trial, Appellant had no concept as to why J.P. was removed from her care.  Appellant cannot see that her conduct and her actions endangered, and would continue to endanger, J.P.  Appellant has no excuse for her refusal to address her mental health issues and her refusal to accept her role in the child’s removal.

II.  Summary

Viewing all the evidence in
 the light most favorable to the judgment, I would hold that the evidence is legally sufficient to support the trial court’s finding that termination of Appellant’s parental rights was in J.P.’s best interest.  
See
 
Tex. Fam. Code Ann.
 § 161.001(2) (Vernon Supp. 2007).  

III.  Conclusion

For the foregoing reasons, I respectfully dissent and would affirm the trial court’s judgment.

BOB MCCOY

JUSTICE

DELIVERED: February 4, 2008

FOOTNOTES
1:
See
 
Tex. R. App. P
. 47.4.

2:
Burt’s testimony indicates that appellant allowed Burt to take J.P. because she was aware that he could not go with her to CRC.  Appellant testified that her memory on July 21, 2005, was “fuzzy,” and she did not recall Burt telling her why J.P. was being removed. 

3:
The trial court had previously terminated the parental rights of D.P., J.P.’s father, and severed that case into a separate cause number on November 22, 2006.

4:
The record does not indicate when appellant moved back in with her mother.

5:
TDFPS investigator Burt testified that D.P. had a history with TDFPS and that his parental rights to his four children had been terminated.

6:
The evidence shows that D.P. lived with appellant at some point, but the record does not indicate when he moved out or why.